**Opinion filed June 11, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-08-00034-CR

_____

### RICHARD LYNN WINFREY SR., Appellant

### V.

### STATE OF TEXAS, Appellee

**On Appeal from the 411th District Court**

**San Jacinto County, Texas**

**Trial Court Cause No. 9525**

## O P I N I O N

The jury convicted Richard Lynn Winfrey Sr. of the offense of murder. Appellant entered pleas of true to two enhancement allegations, and the jury assessed his punishment at confinement for seventy-five years. In two appellate issues, appellant challenges the legal and factual sufficiency of the evidence to support his conviction. We affirm.

*Background*

A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003). A person commits the offense of capital murder if he commits the offense of murder as defined in Section 19.02(b)(1) and he "intentionally commits the murder in the course of committing or attempting to commit . . . robbery." TEX. PENAL CODE Ann. § 19.03(a)(2) (Vernon Supp. 2008). Appellant was indicted for the offense of capital murder. The indictment alleged that, on or about August 6, 2004, appellant "intentionally cause[d] the death of . . . MURRAY WAYNE BURR, by beating him with his hands and fists and by stabbing him with a knife," while appellant was "in the course of committing or attempting to commit the offense of robbery of MURRAY WAYNE BURR." The jury convicted appellant of the lesser included offense of murder.

*Standards of Review*

To determine if the evidence is legally sufficient, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000). To determine if the evidence is factually sufficient, the appellate court reviews all the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006) (overruling in part *Zuniga v. State*, 144 S.W.3d 477 (Tex. Crim. App, 2004)); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11. The jury, as the finder of fact, is the sole judge of the weight and credibility of the witnesses' testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).

*The Evidence at Trial*

Murray Wayne Burr worked as a janitor for the Coldspring Independent School District for about thirty years. He planned to retire in January 2005. He lived alone in a trailer house at 851 Willow Springs Road in San Jacinto County, Texas. Steven Ray Winfrey, who was appellant's second cousin, lived across the road from Burr. Late in the afternoon on Thursday, August 5, 2004, Steven Winfrey saw Burr sitting outside of his house petting a cat. One of Burr's grandnephews saw Burr at about 8:00 p.m. that night. On Friday morning, August 6, 2004, Burr's sister, Dorothy McFadden, dropped her grandchildren off at Burr's house to visit him. Her grandchildren later told her that Burr would not answer the door. She drove by Burr's house that night and noticed that all the lights were on in the house. On Saturday morning, August 7, 2004, McFadden went to Burr's house with her mother, three of her sisters, and a granddaughter. They knocked on the doors and windows, but there was no answer. McFadden had a key to the house, and she opened the door. She testified that she saw a "drag mark" of blood, and she discovered Burr deceased in the bedroom. Burr had been brutally beaten and had been stabbed multiple times. Burr's house had not been ransacked, and the only thing that Burr's family members reported missing was a Bible that had been on the entertainment center.

On August 7, 2004, San Jacinto County Sheriff Lacy Rogers received a call about Burr's murder. He went to Burr's house after receiving the call. Sheriff Rogers testified that there was blood in the living room, that there was a drag mark of blood that went through the kitchen, and that Burr's body was located in the bedroom. Sheriff Rogers contacted the Texas Rangers and the Department of Public Safety crime scene unit about the homicide, and he turned the scene over to Texas Ranger Sergeant Grover F. Huff.

Ranger Huff arrived at the scene the same day. He testified that there was no evidence of forced entry into Burr's house. Ranger Huff examined blood spatter evidence at the scene. The blood spatter evidence indicated that blows had been delivered to Burr in the living room and in the bedroom. Ranger Huff testified that there were bloodstains on the wall and furniture in the living room, the wall and various objects in the bedroom, and clothes hanging in the bedroom closet. He also testified that, based on the existence of a blood drag mark leading from the living room to the bedroom where Burr's body was discovered, Burr had been dragged from the living room to the

3

bedroom. Ranger Huff saw what he believed to be a bloody partial fingerprint or palm print on the front doorknob of the house. He removed the doorknob, and it was sent to the Montgomery County Sheriff's crime laboratory for testing. The crime laboratory found no identifiable fingerprints on the doorknob.

Also on August 7, 2004, personnel from the DPS Crime Laboratory in Houston collected evidence from the crime scene for DNA testing and analysis. They collected swabs of representative samples from the bloodstains, a hair that was found on Burr's pants, hairs from a vacuum cleaner, a hair that was in the bloody drag mark in the kitchen, and other objects from the house.

On August 8, 2004, Ana Lopez, an assistant medical examiner for Harris County, performed an autopsy on Burr. She testified that Burr had a significant amount of blood and trauma on his face and that he had sharp-force and blunt-force injuries. The majority of Burr's injuries were located on his face, neck, and head. Lopez said that Burr had sustained twenty-eight sharp-force injuries, which included both stab wounds and incised wounds. Lopez explained that Burr's stab wounds and incised wounds had sharp ends and blunt ends and that, therefore, the wounds were consistent with the use of a knife with a sharp edge and a blunt edge. Lopez testified that the fatal wound involved the left internal jugular vein and the left external carotid artery. Burr also received multiple blunt-force injuries, including at least ten different lacerations or skin tears on his face and scalp. Burr's right eye orbital was broken and both sides of his jaw were broken. Lopez ruled the manner of death a homicide.

Sheriff Rogers testified that he received information leading him to believe that appellant's children, Megan Winfrey and Richard Winfrey Jr., were persons of interest in the investigation. At that time, Megan Winfrey was sixteen years old and Richard Winfrey Jr. was seventeen years old. The Winfreys lived at 1400 Winfrey Road, which was about one and one-half to two miles away from Burr's house. Sheriff Rogers focused on Megan Winfrey and Richard Winfrey Jr. as possible suspects. Ranger Huff testified that Richard Winfrey Jr., Megan Winfrey, and Megan Winfrey's boyfriend Christopher Hammond became the focus of the investigation and that Adam Szarf, who was Hammond's friend, was also investigated.

On August 16, 2004, Ranger Huff interviewed appellant. Ranger Huff testified that, at that time, appellant was not a person of interest and that he did not consider appellant to be a suspect.

4

Ranger Huff questioned appellant about the activities of his children. During the interview, appellant told Ranger Huff that he had not been involved in the murder, that he did not believe his children had been involved in the murder, that he had not seen Burr in four or five years, and that he had never been in Burr's home. Appellant stated to Ranger Huff that "he was the number one suspect."

Ranger Huff also interviewed Richard Winfrey Jr. and Megan Winfrey. They told him that they had nothing to do with the murder. They also told him that they had been to Burr's house on several occasions. On August 16, 2004, Ranger Huff collected buccal swabs from Richard Winfrey Jr., Megan Winfrey, Christopher Hammond, and Adam Szarf. Ranger Huff also obtained shoelaces from a pair of Christopher Hammond's tennis shoes. The buccal swabs and shoelaces were submitted to the DPS Crime Laboratory for testing.

Ranger Huff contacted Fort Bend County Deputy Sheriff Keith Pikett about performing a scent lineup. Deputy Pikett testified that he specialized as a canine handler and that he trained and worked with bloodhounds. He also testified in detail about the training received by his bloodhounds in tracking human scents and performing human scent lineups. Deputy Pikett said that he had been certified as an expert on bloodhound trails. He had worked regularly with the FBI, and he had also worked with the ATF, the US Marshals, and the DEA. Deputy Pikett had instructed others regarding the use of bloodhounds and scent evidence. He testified that bloodhounds have the biggest olfactory receptors, which makes them good for scent lineups and tracking, and that bloodhounds have the best scent capabilities of dogs. He said that, as a conservative estimate, human beings probably lose about fifteen million skin cells a day and that these skin cells are what a dog is smelling.

Before a scent lineup is conducted, gauze pads are used to collect scent samples from individuals and objects. Gauze pads containing scent samples are maintained in sealed Ziplock bags. Deputy Pikett explained the procedure for conducting scent lineups. Six quart-sized paint cans with numbers on them are placed in a line on the ground about ten walking steps apart. The cans are placed in a crosswind so that scents from the cans do not blow toward other cans. A Ziplock bag containing a scent pad (scent sample) is opened and placed in each can. Deputy Pikett had a large selection of scent samples that he used in conducting scent lineups. He had the scent samples separated by race and gender, and he separated his scent lineups by race and gender.

5

Ranger Huff obtained instructions from Deputy Pikett about how to obtain scent samples. After receiving instructions from Deputy Pikett, Ranger Huff obtained scent samples from the clothing that Burr was wearing at the time of the murder. During his testimony, Ranger Huff explained the process that he used to obtain the scent samples from the clothing. Ranger Huff wore latex gloves while obtaining the samples. He touched gauze pads to Burr's clothing and then placed and sealed the gauze pads in Ziplock bags. Ranger Huff also collected scent pads from Richard Winfrey Jr., Megan Winfrey, Christopher Hammond, and Adam Szarf.

On August 24, 2004, Deputy Pikett conducted scent lineups in a vacant lot near the sheriff's office in Coldspring, Texas. Ranger Huff set up the cans for the lineups in accordance with instructions that he had received from Deputy Pikett. Deputy Pikett gave Ranger Huff scent pads from non-suspects to be used in the lineups, and Ranger Huff used the scent pads that had been collected from Richard Winfrey Jr., Megan Winfrey, Christopher Hammond, and Adam Szarf. Three different lineups were conducted on August 24, 2004. In each of the lineups, Ranger Huff placed the scent pads in the cans, and Deputy Pikett did not know the locations of the scent pads within the cans. Texas Ranger Ronald Duff videotaped the lineups, and the videotape was played during Deputy Pikett's testimony. Deputy Pikett testified about what was shown in the videotape.

Deputy Pikett used two dogs – Quincy and Jag – to conduct the scent lineups. Quincy and Jag sniffed the gauze pads that Ranger Huff had used to obtain the scent from Burr's clothing. The dogs then walked the line of cans containing the scent pads. The positions of the people in the first lineup were D. Cole in Position No. 1; Christopher Hammond in Position No. 2; P. Reed in Position No. 3; Richard Winfrey Jr. in Position No. 4; H. Bunning in Position No. 5; and R. Holman in Position No. 6. The second lineup involved Megan Winfrey's scent pad and scent pads of five other white females. Ranger Huff placed Megan Winfrey's scent pad in Position 6. The third lineup involved Adam Szarf's scent pad and scent pads of five other white males. In the first lineup, Quincy and Jag alerted on the can in Position No. 4, which contained the scent pad of Richard Winfrey Jr. The dogs did not alert on Christopher Hammond's scent pad, which was in the can in Position No. 2. In the second lineup, the dogs alerted on the can at Position No. 6, which contained Megan Winfrey's scent pad. The dogs did not alert on any of the cans during the lineup involving Adam Szarf. Based on the results of the lineups, Deputy Pikett concluded that Richard Winfrey Jr.

6

and Megan Winfrey had left their scents on the clothing that Burr was wearing at the time of his murder.

Personnel from the DPS Crime Laboratory in Houston prepared eight reports related to the processing of evidence that had been submitted to the laboratory for testing and analysis. Robin Freeman, the DNA supervisor at the DPS Crime Laboratory in Houston, testified about the test results. She said that a DNA profile obtained from the items tested was consistent with Burr's DNA profile. She also said that a DNA profile obtained from the hair that was found on Burr's body was consistent with an unknown female. Law enforcement personnel obtained hair samples from a number of females, including Burr's sisters, in an attempt to match them with the profile of the unknown female. The samples were tested at the DPS Crime Laboratory, and no match was found to the unknown female. Freeman also testified that Richard Winfrey Jr., Megan Winfrey, Christopher Hammond, and Adam Szarf were excluded as possible sources of the DNA evidence that had been obtained. In summary, none of the items tested at the DPS Crime Laboratory tied appellant to the murder scene.

Sheriff Rogers testified that he received a break in the case on July 14, 2006, when he and San Jacinto County Deputy Sheriff Lenard Johnson interviewed David Wayne Campbell at the Montgomery County Jail. Campbell and appellant had been cell mates in the Montgomery County Jail. Campbell testified that, during summer 2006, he advised jail personnel that he had possible information about a murder. According to Campbell, appellant told him things that he had heard about a murder. Appellant described a murder that had taken place at Burr's house and how it had occurred. Appellant told Campbell that there had been people at Burr's house and that "somebody [had] unlocked the backdoor as a passageway to let somebody in." Appellant indicated to Campbell that Burr had been beaten and stabbed and that his body had been moved. Campbell testified that he believed appellant indicated "some kind of a gun and some knife collection" had been taken from Burr's house. Appellant did not tell Campbell that he had been involved in Burr's murder. Campbell testified that appellant's main concern had been about his children. Appellant told Campbell that San Jacinto County Sheriff's Department had arrested or was going to arrest his children. At the time of trial, Campbell was incarcerated in the Federal Detention Center in Houston.

7

Sheriff Rogers testified that, before he interviewed Campbell, law enforcement personnel were not aware that guns had been taken from Burr's house. The only thing that Burr's family had discovered missing after the murder was Burr's Bible. After receiving the information about the guns, Sheriff Rogers conducted a follow-up investigation by contacting several of Burr's family members, including Burr's brother-in-law, Jessie Oates. Oates testified that, in summer 2006, the sheriff's office asked him if he could identify the guns that Burr had owned. Oates said that Burr had owned a .22 semi-automatic rifle and a single-shot shotgun. Oates said that Burr had shown him the guns a few months before the murder. Oates did not know whether the guns were in Burr's house at the time of the murder. Burr's family members did not find any guns in the house after the murder. Sheriff Rogers testified that law enforcement personnel conducted a search for the guns but did not find them. As a result of Sheriff Rogers's interview of Campbell, appellant became a primary focus of the investigation. Sheriff Rogers testified that an arrest warrant was issued for appellant for the capital murder of Burr. Appellant, Richard Winfrey Jr., and Megan Winfrey were all arrested on capital murder charges.

On August 22, 2007, Deputy Pikett conducted another scent lineup. The lineup involved a scent sample that had been obtained from appellant and the scent sample that Ranger Huff had obtained from Burr's clothing. Ranger Duff participated in the scent lineup. The lineup was conducted near the Bellaire Police Department in Bellaire, Texas, on a baseball field. Deputy Pikett set the scent lineup cans on the third base foul line and provided Ranger Duff with five scent samples of white males. Ranger Duff testified that Deputy Pikett walked behind his vehicle so that he would not know where the scent samples were being placed. Ranger Duff placed the scent pads in the cans. He placed appellant's scent pad in the can at Position No. 4. He testified that the scent samples were contained in Ziplock plastic bags and that he opened the bags after placing them in the cans. Deputy Pikett testified that he did not know the location of appellant's scent sample before the dogs performed the lineup. Lamar Jones, an investigator for the San Jacinto County District Attorney's Office, videotaped the lineup, and the videotape was played for the jury during Deputy Pikett's testimony. Deputy Pikett testified about what was depicted in the videotape.

Deputy Pikett used three dogs – James Bond, Quincy, and Clue – to conduct the scent lineup. Ranger Duff pre-scented the dogs on the scent samples that had been obtained from Burr's clothing.

8

All three dogs alerted on the can in Position No. 4, which contained appellant's scent sample. Based on the results of the scent lineups, Deputy Pikett concluded that appellant's scent was on the clothing Burr was wearing at the time of his death.

Deputy Pikett also provided testimony about the reliability of his dogs. He testified that they were extremely accurate. Quincy had performed 1,483 scent pad cases. Early in her career, Quincy was wrong in two of her identifications. In the last six or seven years, Quincy had not been proved to be wrong on any occasion. James Bond had performed 964 scent pad lineups and had not been proved to be wrong on any occasion; Jag had performed 413 scent pad lineups and had not been proved to be wrong on any occasion; and Clue had performed 406 scent pad lineups and had not been proved to be wrong on any occasion.

Defense counsel questioned Deputy Pikett about transferred scent. Deputy Pikett testified that it is possible for human beings to transfer scents, such as by shaking hands. He also testified that, in conducting scent lineups, the dogs were looking for "significant physical contact." In the absence of physical contact between people, Deputy Pikett doubted that the dogs could detect one person's scent on the other person. Deputy Pikett thought that boyfriends and girlfriends, such as Megan Winfrey and Christopher Hammond, would have more physical contact between each other than family members, such as appellant, Richard Winfrey Jr., and Megan Winfrey, would have with each other. Although Megan Winfrey and Christopher Hammond may have had physical contact with each other as boyfriend and girlfriend and transferred their scents to each other, the dogs did not alert on Christopher Hammond's scent pad in the first scent lineup. Therefore, Deputy Pikett believed that Christopher Hammond did not have significant enough contact with Burr to have left his scent on Burr's clothing.

*Analysis*

Although appellant told Ranger Huff that he had not seen Burr in four or five years and that he had never been in Burr's home, the results of the August 22, 2007 scent lineup showed that appellant's scent was on the clothes that Burr was wearing when he was murdered. Deputy Pikett's canine scent testimony provided direct evidence placing appellant in contact with Burr's clothing.[1]

---

[1] In *Winston v. State*, 78 S.W.3d 522 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd), the court held that Deputy Pikett's scent-lineup testimony was reliable and, therefore, admissible.

Deputy Pikett testified in detail about the training and reliability of his bloodhounds, and the jury viewed the videotape of the lineup. All three of the dogs alerted on appellant's scent during the lineup. Based on the scent-lineup evidence, the jury could have reasonably concluded that appellant was in Burr's house at the time of the murder and that he had significant physical contact with Burr. The lack of DNA evidence connecting appellant to the murder did not require the jury to conclude that he did not commit the murder. *See Tinker v. State*, 148 S.W.3d 666, 669 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (The lack of DNA or other physical evidence did not render the evidence factually insufficient to support the defendant's conviction.).

Appellant told Campbell that "some kind of a gun and some knife collection" had been taken from Burr's house. Before Sheriff Rogers's interview of Campbell, the police had no information that guns had been taken from the house. Thus, appellant shared information about the murder with Campbell that was not even known by the police. Under this circumstance, the jury may have reasonably concluded that such information would only be known by the murderer or murderers. Additionally, appellant identified himself as the "number one suspect" in the murder at a time when the police did not consider him to be a suspect.

After reviewing all the evidence, we hold that the evidence is legally and factually sufficient to support appellant's conviction. We overrule appellant's issues.

*This Court's Ruling*

We affirm the judgment of the trial court.

TERRY McCALL

JUSTICE

June 11, 2009

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.