IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0987-09





 

RICHARD LYNN WINFREY, Appellant



v.



THE STATE OF TEXAS







ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

FROM THE ELEVENTH COURT OF APPEALS

SAN JACINTO COUNTY




 Hervey, J., delivered the opinion of the Court in which Keller, P.J., Price, 
Womack, Johnson, Keasler, Holcomb and Cochran, JJ., joined. Cochran, J ., 

filed a concurring opinion in which Womack, Johnson and Holcomb, JJ., joined. 
Meyers, J., did not participate. 

 

O P I N I O N



 Charged with the capital murder of Murray Wayne Burr, appellant was convicted of the
lesser offense of murder and sentenced to seventy-five years in prison. We reverse the court of
appeals and render an acquittal.

I. Factual & Procedural Background

 In August 2004, Murray Wayne Burr was found murdered in his home. Evidence at trial
indicated that the victim had been stabbed twenty-eight times and had received multiple blunt-force
injuries, including a broken right-eye orbit and a broken jaw. There was no evidence of forced entry
into the victim's home. The evidence indicated that the victim was dragged from his living room
to his bedroom where his body was found. Family members reported that the only item missing
from the victim's home was a Bible.

 Investigators collected a variety of forensic evidence from the crime scene including: a partial
bloody fingerprint, a bloody shoe print, and several hair samples. Neither the prints nor the hair
samples matched appellant. Investigators were able to obtain a DNA profile from evidence at the
crime scene, however, the profile excluded appellant and his family members. (1) Appellant's children,
Megan (then 16 years of age) and Richard Winfrey Jr. (then 17 years of age), became persons of
interest in the murder investigation. Texas Rangers interviewed appellant approximately two weeks
after the murder. Appellant was not considered a suspect at this time. During the interview,
appellant stated that he had known the victim, that he had never been in the victim's house, that he
had not seen the victim in four to five years, and that he assumed he was the number one suspect. (2)

 In July 2006, the Sheriff's Department received new information about the Burr murder from
David Campbell, an inmate in the Montgomery County Jail. Campbell testified at the trial that,
while he was sharing a cell with appellant, appellant relayed information that he claimed to have
heard about the murder; specifically, that "some kind of gun and some knife collection" were taken
from the Burr residence. Appellant related other details to Campbell that he claimed to have heard
about the murder, such as the victim's body being dragged from one room to another and the lack
of forced entry. Appellant did not tell Campbell that he was involved in the murder.

 To assist in the investigation, Texas Ranger Grover Huff contacted Deputy Keith Pikett, a
dog handler with the Fort Bend County Sheriff's office. Deputy Pikett testified about a "scent
lineup" that he conducted nearly three years after the murder in August 2007. He used his three
bloodhounds, Quincy, James Bond, and Clue. This involved obtaining scent samples from clothing
that the victim was wearing at the time of his death and from six white males, including appellant. 
The dogs were "pre-scented" on the scent samples obtained from the victim's clothing. The dogs
then walked a line of paint cans containing the scent samples of the six white males. All three dogs
alerted on the can containing appellant's scent sample. (3)

 Based on this, Deputy Pikett concluded that appellant's scent was on the victim's clothing. 
Deputy Pikett testified on cross-examination that an alert only establishes some relationship between
the scent and objects and that scent detection does not necessarily indicate person-to-person contact. (4)Deputy Pikett also testified on cross-examination that his understanding of the law was that
convicting a person solely on a dog scent is illegal.

 Appellant complained on direct appeal that the evidence is legally and factually insufficient
to support a conviction of murder. In its published opinion affirming the trial court, the court of
appeals addressed the sufficiency of the evidence in a two-paragraph analysis. Concluding that the
evidence was legally and factually sufficient, the court of appeals specifically found: (1) Deputy
Pikett's canine-scent testimony provided direct evidence placing appellant in direct contact with
Burr's clothing; (2) the jury could have reasonably concluded that appellant was in Burr's house at
the time of the murder and that he had significant physical contact with Burr; (3) appellant shared
information about the murder with Campbell that was not known, even by the police; and (4)
appellant identified himself as the "number one suspect" in the murder at a time when the police did
not consider him a suspect. Winfrey v. State, 291 S.W.3d 68, 75 (Tex.App.-Eastland 2009).

 Pursuant to Rule 68 of the Texas Rules of Appellate Procedure, appellant timely filed a
petition for discretionary review. We granted review to address the following grounds presented to
this court:

 (1) An important question implicating the administration of justice is presented
by the Court of Appeals' reliance upon a dog scent lineup to sustain the legal
sufficiency of the evidence without regard to the inherent limitations of such
evidence.

 

 (2) An important question implicating the administration of justice is also
presented by the Court of Appeals' failure to properly evaluate the factual
sufficiency of the evidence by addressing the inherent limitations of dog scent
lineup evidence.


 Appellant contends the evidence, when viewed in a neutral light, is factually insufficient to
support a conviction of murder. He further contends that the evidence, even when viewed in the
light most favorable to the verdict, is legally insufficient to support a conviction of murder. The
State argues that the court of appeals applied the proper standards of review for legal and factual
sufficiency and that a jury could have reasonably concluded that appellant murdered Murray Wayne
Burr. 

II. Standard of Review

 We begin our analysis by addressing the question of legal sufficiency. When reviewing a
case for legal sufficiency, we view all of the evidence in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Consequently, we
"determine whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to the verdict." Clayton
v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing Hooper v. State, 214 S.W.3d 9, 16-17
(Tex. Crim. App. 2007)). It has been said, quite appropriately, that "[t]he appellate scales are
supposed to be weighted in favor of upholding a trial court's judgment of conviction, and this
weighting includes, for example, the highly deferential standard of review for legal-sufficiency
claims." Haynes v. State, 273 S.W.3d 183, 195 (Tex. Crim. App. 2008) (Keller J., dissenting) (citing 
Jackson v. Virginia, 443 U.S. at 319). We must therefore determine whether the evidence presented
to the jury, viewed in the light most favorable to the verdict, proves beyond a reasonable doubt that
appellant intentionally or knowingly caused the death of Murray Wayne Burr.


III. Analysis 

A. Appellant's Statement to Authorities

 During trial, Texas Ranger Grover Huff testified that he interviewed appellant in 2004 and
that appellant indicated that he was the number one suspect.

 Q. And did he indicate whether he had ever been in Murray Burr's home?

 A. He stated that he had never been inside of Murray Burr's residence.

 Q. Did he indicate whether he thought he was a suspect?

 A. Yes.

 Q. What did he indicate? 

 A. His statement to me was he was the number one suspect.

 In closing arguments, the prosecution emphasized this statement as evidence of appellant's 
guilt.

 I think defense counsel said in closing there is nothing to put Richard Lynn Winfrey,
Sr., in that trailer. Nothing to put Megan Winfrey or Richard Winfrey, Jr. First of
all, early in the investigation, when they were looking at Megan Winfrey and Richard
Lynn Winfrey, Jr., Ranger Huff said he went and talked to Richard Sr. They were
looking at the kids. Kind of interesting, what was Richard Lynn Winfrey, Sr.'s,
words, "Well, I guess I'm the primary suspect here." He said he is the primary
suspect at that point in time.


 In its briefs to the court of appeals and to this Court, the State relies on appellant's statement
as evidence of his guilt. (5) Indeed, in affirming appellant's conviction, the court of appeals relied on
appellant's statement, concluding that "appellant identified himself as the 'number one suspect' in
the murder at a time when the police did not consider him a suspect." Winfrey, 291 S.W.3d at 75. 
This statement is not tantamount to an admission of guilt. At no time during the interview did
appellant admit to any involvement. Nor did the police consider him a suspect, much less a primary
one. The Texas Ranger who interviewed appellant placed little emphasis on the statement and
acknowledged that even after the statement, appellant was not a suspect. In fact, he was not arrested
until nearly three years later. 

B. Cellmate

 The court of appeals also found it significant that appellant "shared information about the
murder with Campbell that was not even known by the police" and that "would only be known by
the murderer or murderers." Winfrey, 291 S.W.3d at 74. According to the court of appeals,
appellant "told Campbell that 'some kind of a gun and some knife collection' had been taken from
Burr's house." (6) id. 

 The evidence, however, is that appellant told Campbell that he heard that "some kind of a
gun and some knife collection" were taken from the victim's home. That appellant stated that he had
heard that a gun or knife collection was taken is a subtle, yet significant distinction. Appellant never
told Campbell that he was involved in the murder. Campbell himself made it clear that his entire
testimony was based on information that appellant had heard. 

 Q. [Defense] The things that you said that Mr. Winfrey told you while in
Montgomery County jail was [sic] things that Mr. Winfrey told you that he
had heard; is that correct?


 A. [Campbell] Yes.

 Q. [Defense] Things that he had heard, it had been two years since the death of
Mr. Burr. And the things that Mr. Winfrey told you was [sic] things that he
told you that he had heard?


 A. [Campbell] Yes, that's what I said, hearsay.

* * *

 Q. [State] When he told you about Murray being beaten and stabbed, no one in
law enforcement had contacted you?


 A. [Campbell] It was all hearsay what I heard from him, just hearsay.

 Q. [State] And he told you about the penis, (7) nobody had talked to you about
anything?


 A. [Campbell] It is just hearsay from what he was going to be charged with.

 Q. [State] And when he told you that somebody had let the actor in the house,
nobody from law enforcement had talked too [sic] you about a murder at that
time?


 A. [Campbell] No sir, just hearsay directly from him.

 The court of appeals found that appellant "told Campbell that 'some kind of a gun and some
knife collection' had been taken from Burr's house. Before Sheriff Rogers's interview of Campbell,
the police had no information that guns had been taken from the house. Thus, appellant shared
information about the murder with Campbell that was not even known by the police." Winfrey, 291
S.W.3d at 74. Appellant never admitted involvement in the murder and claimed only to have heard
information about the crime not known to the police. Thus, it is possible that the information
appellant heard could have come from the actual murderer or murderers. 

C. Dog-Scent Lineup

 At the request of the Texas Rangers, Deputy Keith Pikett performed the dog-scent lineup. (8) 
Deputy Pikett, a certified peace officer who specializes in canine handling, testified that he had been
training bloodhounds since 1989. At trial, Deputy Pikett explained the scent lineup procedure:

 We use 6-quart paint cans that have numbers on them. They're just clean paint cans,
and I put a piece of wood on the bottom of them so they are more stable and they're
numbered. I set the paint cans out. I typically go like ten walking steps, put a can
down; ten walking steps, put a can down. The cans are placed so there-with a
crosswind-so if the can is here and the next can is here, the wind is going either this
way or this way. We don't want the scent from can 2 blowing toward 3 or toward
can 1. We want the wind to be blowing away, so it's not going to cross-contaminate
that way. So we check that. Then I set the cans out.


 On August 22, 2007, a scent lineup was conducted, and appellant's scent was placed in paint
can number four. Deputy Pikett had no knowledge where appellant's scent was placed. He used
three bloodhounds during this scent lineup: James Bond, Quincy, and Clue. All three alerted to
appellant's scent in paint can number four. 

 This however, is not proof positive that appellant came in contact with the victim. Even
when viewed in the light most favorable to the verdict, the dog-scent lineup proves only that
appellant's scent was on the victim's clothes, not that appellant had been in direct contact with the
victim, as the court of appeals decided. 

 This important distinction is highlighted in the Federal Bureau of Investigation's publication,
Forensic Science Communications, which explains that "[i]dentifying someone's scent at a crime
scene is not an indication of complicity. It simply establishe[s] a direct or indirect relationship to
the scene." Rex A. Stockham et al., Specialized Use of Human Scent in Criminal Investigations, 
6 Forensic Sci. Comm. 3, 6 (2004). This sentiment was echoed in Deputy Pikett's testimony.

 Q. [Defense Counsel] All it does is establish a scent relationship between the
articles?


 A. [Deputy Pikett] You mean between the person and the clothing?

 Q. [Defense Counsel] The scent matches, yes.

 A. [Deputy Pikett] Yes.

 During his testimony, Deputy Pikett acknowledged, "It's possible to transfer scent. . . . If I
shake hands with you, I can give you the scent on my hand." The ease of transferring scents is well
documented and is also accepted by law enforcement agencies such as the FBI. Id. at 1 ("Because
human scent is easily transferred from one person or object to another, it should not be used as
primary evidence. However, when used in corroboration with other evidence, it has become a
proven tool that can establish a connection to the crime."). 

 At oral argument, the State conceded that "dog scent alone is not enough [to convict the
defendant]." Deputy Pikett also recognized the limitations of the scent lineup in his testimony when
he stated that: "We never convict anybody solely on the dog. It is illegal in the State of Texas. . . . 
You cannot convict solely on the dog's testimony." However, the record indicates, and the State
acknowledged, that the jury gave significant weight to the canine-scent evidence. The jury submitted
a note asking, "Is it illegal to convict solely on the scent pad evidence?" (9) No eye witnesses put the
appellant at the crime scene. The State was unable to match the appellant to the fingerprint or to any
of the footprints found at the crime scene. The appellant did not match the DNA profile obtained
from the crime scene. Criminologists microscopically compared seventy-three hairs recovered from
the crime scene, yet none of the hairs were consistent with appellant's. None of the victim's
belongings were found in appellant's possession. Not a Bible, a gun, or a knife collection. Winfrey,
291 S.W.3d at 72 ("In summary, none of the items tested at the DPS crime laboratories tied appellant
to the murder scene.").

 The Jackson v. Virginia legal-sufficiency standard requires the reviewing court to view the
evidence in the light most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S.
at 319. At most, the evidence here shows: (1) appellant indicated that he believed he was the number
one suspect in a murder investigation; (2) appellant shared information with Campbell that appellant
claimed to have heard about the murder; and (3) appellant's scent was on the victim's clothes. It is
the obligation and responsibility of appellate courts "to ensure that the evidence presented actually
supports a conclusion that the defendant committed the crime that was charged." Williams v. State,
235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Furthermore, "[i]f the evidence at trial raises only
a suspicion of guilt, even a strong one, then that evidence is insufficient [to convict]." Urbano v.
State, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992), superseded in part on other grounds, Herrin
v. State, 125 S.W.3d 436, 443 (Tex. Crim. App. 2002). Based on our review of this record, we find
that the evidence, even when viewed in the light most favorable to the verdict, merely raises a
suspicion of guilt and is legally insufficient to support a conviction of murder beyond a reasonable
doubt. Because we find the evidence legally insufficient, we need not address appellant's factual-sufficiency claim. 

 We note, however, that the science underlying canine-scent lineups has been questioned;
thus, we think it proper to briefly address the issue. Law-enforcement personnel have long utilized
canines in crime management. For example, dogs have been employed for detecting narcotics and
explosives, for tracking trails, in search-and-rescue operations, for locating cadavers, and for
discriminating between scents for identification purposes. In thousands of cases, canines and their
handlers have performed with distinction. Despite this success, we acknowledge the invariable truth
espoused by Justice Souter that "[t]he infallible dog, however, is a creature of legal fiction." Illinois
v. Caballes, 543 U.S. 405, 411 (2005) (Souter J., dissenting). 

 This case pertains to canines used to discriminate among human scents in order to identify
a specific person in a lineup. This process is often referred to as human-scent discrimination. Some
courts, including the Fourteenth Court of Appeals, have determined that for purposes of
admissibility, "there is little distinction between a scent lineup and a situation where a dog is
required to track an individual's scent over an area traversed by multiple persons." Winston v. State,
78 S.W.3d 522, 527 (Tex. App.--Houston [1st Dist.] 2002, pet. ref'd) (citing Roberts v. State, 469
A.2d 442, 447-48 (Md. Ct. App. 1983)). Other courts, such as the Supreme Court of Florida, have
distinguished scent lineups from dog tracking. Ramos v. State, 496 So. 2d 121, 123 (Fla. 1986) ("[I]t
is important to recognize that using a dog to track a human or to detect the presence of drugs or
explosives is distinctive from using a dog to directly identify a specific human from items in a
lineup."). 

 Cases involving the use of dogs, usually bloodhounds, to track humans are abundant and
the law is well settled in regards to admissibility of such evidence with only a minority of courts
outright rejecting bloodhound evidence. People v. Cruz, 643 N.E.2d 636, 662 (Ill. 1994); Brafford
v. State, 516 N.E.2d 45, 49 (Ind. 1987); State v. Storm, 238 P.2d 1161, 1181-82 (Mont. 1952); Brott
v. State, 97 N.W. 593, 594 (Neb. 1903). Fewer courts have addressed the question of whether dog
evidence is sufficient to sustain a conviction when it is the only evidence. However, as early as
1913, our colleagues at the Supreme Court of Mississippi held that dog tracking evidence, alone and
unsupported, to be insufficient to affirm a conviction. Carter v. Mississippi, 64 So. 215, 215 (Miss.
1913). And as recently as 1983, the Supreme Court of Washington agreed. State v. Loucks, 656
P.2d 480, 483 (Wash. 1983). In fact, our research suggests the courts that have passed on this issue
have concluded that dog-scent evidence, when admissible, is insufficient, standing alone, to sustain
a conviction. State v. Taylor, 395 A.2d 505, 507 (N.H. 1978); State v. Cheatham, 458 S.W.2d 336,
339 (Mo. 1970); State v. Green, 26 So. 2d 487, 489 (La. 1946); Buck v. State, 138 P.2d 115, 123
(Okla. Crim. App. 1943); Copley v. State, 281 S.W. 460, 461 (Tenn. 1926).

 Like our sister courts across the country, we now hold that scent-discrimination lineups,
whether conducted with individuals or inanimate objects, to be separate and distinct from dog-scent
tracking evidence. "Even the briefest review of the scientific principles underlying dog scenting
reveals that, contrary to the conclusions of many courts, there are significant scientific differences
among the various uses of scenting: tracking, narcotics detection, and scent lineups." Andrew E.
Taslitz, Does the Cold Nose Know? The Unscientific Myth of Dog Scenting, 42 Hastings L.J. 15,
42 (1990) (explaining that drug detection canines need only determine whether a specific scent is
present. Tracking dogs, on the other hand, have the benefit of using both vegetative scents and
human scent, while canines performing scent lineups must find one specific scent among many
competing, similar scents). The FBI agrees, noting that tracking canines use human scent and
environmental cues to locate the track of an individual. Allison M. Curran, et al., Analysis of the
Uniqueness and Persistence of Human Scent, 7 Forensic Sci. Comm. 2 (2005). Accordingly, we
conclude that scent-discrimination lineups, when used alone or as primary evidence, are legally
insufficient to support a conviction. Like the Supreme Court of Washington, we believe that "[t]he
dangers inherent in the use of dog tracking evidence can only be alleviated by the presence of
corroborating evidence." Loucks, 656 P.2d at 482. To the extent that lower-court opinions suggest
otherwise, we overrule them and expressly hold that when inculpatory evidence is obtained from
a dog-scent lineup, its role in the court room is merely supportive.

 The State argues in its brief:

 During the videotaped canine scent lineup on August 22, 2007, all the dogs made
positive hits on [appellant's] scent pads, indicating that [appellant] had been in
contact with the clothes [the victim] was wearing at the time of his death. (10) This is
significant because in the earlier interview with [appellant] in 2004, he indicated
that he had NEVER been in [the victim's] home and had not seen [the victim] in
five years.


 An effort was made by defense counsel to advance a theory of "transferred scent"
or "casual contact" to explain how [appellant's] scent would be on the clothes the
victim had on at the time of death. Keith Pikett testified that the scent is essentially
from skin cells sloughed off by the provider of the skin cells. (11) Pikett testified that,
based on the scent lineups, [appellant's daughter, appellant's son and appellant] had
left their scent on the clothes the victim was wearing at the time of his death. 
Following cross-examination, Pikett also indicated that a boyfriend and girlfriend
would have significant contact with each other, more than with family members. 
But none of the dogs hit on Christopher Hammond's scent pads. In that regard the
jury could certainly draw the inference that if [appellant's daughter's] boyfriend at
the time of the murder was Christopher Hammond, then under the transferred scent
or casual contact theory, it would be MORE likely that if she touched [the victim's]
clothes, Hammond's scent rather than her father, [appellant's] scent would have
been transferred.


(Emphasis in original and record reference omitted).


 It cannot be denied that the jury and the court of appeals found the dog-scent lineup
evidence in this case to be compelling. In 2004, two different dogs alerted only to the scents of
appellant's son and daughter. In 2007, three different dogs alerted only to appellant's scent. But,
the question essentially presented in this case is whether dog-scent lineup evidence alone can
support a conviction beyond a reasonable doubt. And, while this evidence may raise a strong
suspicion of appellant's guilt, we nevertheless decide that, standing alone, it is insufficient to
establish a person's guilt beyond a reasonable doubt.

 The judgment of the court of appeals is reversed, and a judgment of acquittal is entered. 
Burks v. United States, 437 U.S. 1, 18, (1978) (holding if the record evidence is legally insufficient
under the Jackson rule, the reviewing court must render a judgment of acquittal). 


 J. Hervey


Delivered: September 22, 2010

Published:
1. According to appellant's discretionary-review petition: 1) appellant and both his
children (Megan and Richard Jr.) were indicted for the capital murder of Murray Wayne Burr, 2)
Megan was convicted of capital murder and conspiracy and her appeal is currently pending, and
3) Richard Jr. was acquitted of capital murder and conspiracy. 
2. The videotaped interview was not included in the appellate record, although the Texas
Ranger who interviewed appellant discussed the conversation in his testimony. 
3. An "alert" occurs when the canine matches the scent from the victim's scent pad to the
suspect's scent pad. A similar "scent lineup" was conducted in August 2004 on scent samples
from appellant's children with two dogs, Quincy and Jag. Both of these dogs alerted on the
children's scent samples. 
4. The State seems to claim that Pikett testified that the results of the dog-scent lineup
established direct contact between appellant and the victim's clothes at the time of the victim's
death. We do not so read Pikett's testimony. Pikett testified on direct examination:


 Q. [State] Now, based on the results of that final scent lineup, do you believe that the
scent of [appellant] is on the scent on the clothing of [the victim]?

 A. [Pikett] Yes.


Pikett testified on cross-examination:


 Q. [Defense Counsel] All it does is that it establishes a relationship, does it
not?

 A. [Pikett] It puts that person in contact with something.

 Q. It puts the person in contact with something, not necessarily person-to-person, does it?

 A. No. Without knowing the specifics of anything, no, you can't say that.

 Q If I come up and I shake your hand, am I going to get some of your skin
cells?

 A. Yes.

 Q. Now, if I come over here and grab [one of the prosecutors] on the arm,
have your skin cells transferred to him?

 A. Yes.

 Q. Did you touch him?

 A. No.

 

* * *


 Q. Again, an alert by a dog is nothing but to establish some sort of a relationship
between the scents and the objects, would you agree?

 A. Yes.


On redirect examination, Pikett testified:


 Q. [State] So that's essentially what you've been testifying to all along, physical
contact?

 [Defense] I object to that, Your Honor, physical contact made between objects, if you
would clarify that.

 Q. [State] Physical contact where someone else leaves their scent on someone
else through physical contact.

 A. Yes.


* * *

 

 Q. And that's what we're talking about, significant physical contact.

 A. Yes.

 Q. And that's all your dogs are looking for; is that correct?

 A. Yes.


On recross-examination, Pikett testified:


 Q. All it does is establish a scent relationship between the articles.

 A. You mean between the person and the clothing?

 Q. The scent matches, yes.

 A. Yes.
5. In its brief to the court of appeals, the State argued that "Richard Winfrey Sr. indicated
to Texas Ranger Grover Huff that he was the primary suspect early in the investigation when
Huff was focusing on Winfrey's children." In its brief to this Court, the State argues "Coupled
with the statements made during the interview with Ranger Huff, when Petitioner stated he had
never been in the Burr home and had not seen Burr in five years, and at the same time stated he
was the 'number one suspect,' the jury, as trier of fact, could certainly attach a great weight to the
canine scent evidence in light of Petitioner's contradictory statements."
6. In the summer of 2006, the Sheriff's Department interviewed Jessie Oates, the victim's
brother-in-law. Oates informed the Sheriff's department that the victim owned a rifle and a shot-gun, which the victim showed to him about six months before the murder. Oates did not know if
these guns were in the victim's home when he was murdered. Neither of these guns nor a knife
collection was ever recovered. It is questionable whether the evidence would support a finding
that these guns were taken from the victim's house at the time of the murder. We will, however,
assume that, viewed in the light most favorable to the verdict, the evidence supports a finding
that "some kind of a gun and some knife collection" were taken from the victim's home.
7. Appellant also told Campbell that he had heard that the victim's penis had been
mutilated, a statement that was inaccurate.
8. A scent lineup is a forensic tool where dogs use their enhanced sense of smell to match
scents. Using a gauze pad, scent exemplars are obtained from the crime scene or from an object
found at the crime scene, as well as from a suspect. The gauze pad with the suspect's scent is
then placed in a "lineup" with several other scents. Before doing the lineup, the dog sniffs the
gauze pad from the crime scene. The dog then walks the lineup and alerts if it recognizes any of
the scents. 
9. In a written response, the trial court replied, "I can only refer you to the instructions in
the charge." 
10. We do not read the phrase, "indicating that [appellant] had been in contact with the
clothes [the victim] was wearing at the time of his death," as necessarily meaning that appellant
had direct contact with the victim's clothes at the time of the victim's death. Consistent with
Pikett's testimony, we understand this phrase to mean that appellant's scent was on the victim's
clothes at the time of the victim's death. 
11. Pikett testified that "human beings lose probably conservatively 15 million skin cells a
day" and "that's what the dog is smelling." Pikett also testified that the dog is trained to smell
human skin cells but that he did not know what "ingredient" the dog is smelling. The State
argued during closing jury arguments that it could not tell the jury "the mechanics of how the
dogs do what they do, but they sure do it."