

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## NUMBER 13-09-00112-CR

**CHADRICK B. PATE,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                 **Appellee.**

### On appeal from the 36th District Court
### of Aransas County, Texas.

## NUMBER 13-09-00149-CR

**CHRISTOPHER JOSEPH HALL,**                                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                 **Appellee.**

### On appeal from the 36th District Court
### of Aransas County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza**
**Memorandum Opinion by Justice Garza**

We withdraw our memorandum opinion and judgments of August 25, 2010, and

substitute the following in its place.

Appellants, Chadrick B. Pate and Christopher Joseph Hall, were convicted of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003). Pate and Hall were sentenced to ninety-nine-year prison terms and were each assessed $10,000 fines. By four issues, Pate argues on appeal that: (1) there was insufficient non-accomplice testimony presented at trial; (2) the evidence was legally and factually insufficient to sustain his conviction under the law of parties; (3) the trial court's jury charge contained various errors; and (4) the State's attorney made an improper statement during closing argument. Hall joins in Pate's fourth issue and part of Pate's third issue and also contends that the trial court abused its discretion by admitting certain evidence. We affirm.

## I. BACKGROUND

On June 24, 2008, an Aransas County grand jury indicted Pate, Hall, Michael Jason Underwood, Anthony Lee Ray, and Kevin Ray Tanton on counts of murder and engaging in organized criminal activity. *See id.* §§ 19.02, 71.02 (Vernon Supp. 2009).[1] The murder count of the indictment alleged that those individuals, "acting alone and together," intentionally or knowingly caused the death of Aaron Watson on or about January 4, 2008 by shooting Watson with a firearm. After making initial statements to police, Underwood, Ray, and Tanton entered into agreements with the State whereby they would provide testimony against Pate and Hall in exchange for recommended sentences of fifteen years' imprisonment or less. Pate and Hall were then tried together before a jury over four days in February 2009. At trial, the State called twenty-one witnesses to testify against the defendants, after which the defendants rested without calling any witnesses. Pate and Hall

---

[1] Under section 71.02 of the penal code, a person engages in organized criminal activity if, "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit one" of several defined offenses. TEX. PENAL CODE ANN. § 71.02 (Vernon Supp. 2009). Here, Pate and Hall were charged specifically with committing the predicate offense of aggravated assault. *See id.* § 22.02 (Vernon Supp. 2009).

2

were subsequently found guilty of murder,[2] sentenced to ninety-nine years in the Institutional Division of the Texas Department of Criminal Justice, and ordered to pay $10,000 fines. These appeals followed.[3]

## II. THE EVIDENCE

### A. Michael Huffman

Deputy Michael Huffman of the Aransas County Sheriff's Office testified that in the early morning hours of January 4, 2008, he was dispatched to a trailer residence in Fulton, Texas, to respond to a disturbance in progress. He arrived to find a "distraught" and "screaming" young female "standing in the roadway." The girl told Deputy Huffman that "[m]y daddy's been shot" and pointed to the backyard of an adjacent residence, where the girl's father, Aaron, lay on his side, drifting in and out of consciousness. Deputy Huffman observed gunshot wounds on Aaron's lower left abdomen and left leg. Aaron was evacuated via helicopter to Christus Spohn Memorial Hospital in Corpus Christi, where he later died of his injuries.

### B. Michael Brooks

Michael Brooks, an investigator with the Aransas County Sheriff's Office, testified that he was also dispatched to the Watsons' trailer in Fulton on the early morning of January 4, 2008. Investigator Brooks stated that he had met the victim before and that "Tracy Watson, [J.W.], [M.W.], Chadrick Pate, [and] Aaron Watson" lived in the trailer "at one time or another."[4] He then identified several photographs, which were admitted into

---

[2] After finding Pate and Hall guilty of murder, the jury, as instructed, did not enter a finding as to whether Pate and Hall were guilty of engaging in organized criminal activity by committing aggravated assault as members of a criminal street gang. *See id.* § 71.02; *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999) (noting that "aggravated assault can be a lesser-included offense of murder").

[3] We note that the State's appellee's brief in appellate cause number 13-09-00112-CR violates the rules governing such briefs in that the argument presented therein exceeds fifty pages in length. *See* TEX. R. APP. P. 38.4. Moreover, the State did not file a motion for leave to file a brief exceeding that page limit. Nevertheless, in our sole discretion, we choose to accept the State's brief and consider the initial fifty pages of argument.

[4] The evidence established that Tracy was Aaron's wife and that J.W. and M.W. are the couple's teenage daughters. To protect the children's identities, we refer to them by their initials. *See* TEX. R. APP. P. 9.8.

3

evidence without objection, depicting what he observed when he arrived at the scene. Investigator Brooks testified that, "just into the doorway" of the trailer, he found and collected "two unspent shell casings" and "one spent shell casing" for a .38-caliber firearm. He also recovered a "light blue jean, long-sleeve shirt that . . . belonged to the victim" and a wristwatch from the adjacent backyard, as well as a baseball bat from the front of the Watsons' trailer, and paperwork from inside the trailer. According to Investigator Brooks, the blue shirt had a "bullet hole" and a "small amount of blood" which was later determined to belong to the victim.

Investigator Brooks spoke with Tracy "later that morning." According to Investigator Brooks, Tracy "gave us some information on some subjects . . . . She said a couple of people had came down to take care of a guy named J.R. or help Chad take care of a guy named J.R. and she gave some name of Ziggy (ph) and a Thunderwood (ph)."[5] Using this information, as well as other information obtained from police in Houston, Investigator Brooks determined that "Thunderwood" referred to Michael Underwood.[6] Photo arrays were then presented to J.W. and M.W.; the girls identified Underwood as being present at the crime scene and Underwood was then arrested. Underwood gave a statement to police which led to Pate, Hall, Ray and Tanton being identified as suspects in the case.[7] Ray and Tanton were arrested and interviewed by police, and their stories regarding what happened on the night in question were consistent with Underwood's. Tanton also provided information that led to the recovery of a weapon from the bottom of Copano Bay by a police dive team. The weapon, a .38-caliber revolver, was introduced into evidence.[8]

---

[5] According to Investigator Brooks, when he asked Tracy whether Aaron "might have had problems with or owed money to" anyone, Tracy noted that Aaron owed four hundred dollars to an individual nicknamed "Doughboy."

[6] Investigator Brooks further testified that "Ziggy" referred to Christopher Hall.

[7] According to Investigator Brooks, the statements of Underwood, Ray, and Tanton led police to eliminate "Doughboy"—identified as Justin Padgett—as a suspect in Aaron's murder.

[8] Richard Hitchcox, a forensic firearms and toolmarks examiner with the Texas Department of Public Safety, testified that he could not perform ballistics testing on the gun because it was in "very poor condition" at the time he received it.

4

On cross-examination, Investigator Brooks stated that neither Ray nor Tanton were promised anything in exchange for their initial statements. He also confirmed that J.W. and M.W. had given two other names of potential suspects—"Ace" and "Charles"—but that those individuals had not been identified or located by police. On re-direct examination, Investigator Brooks stated that Hall, Pate, and Underwood are members of a prison gang called the Aryan Circle, and that he believed Ray and Tanton are prospective members of that gang. He also stated that an individual named Wayne Scott was mentioned by each of the suspects as "a high-ranking official" in the Aryan Circle but that police had not done any investigation as to Scott. Finally, Investigator Brooks stated that he presented photo arrays to J.W. and M.W. and both girls identified Hall as having been present at the crime scene.[9]

Investigator Brooks, upon being recalled to the stand later in the trial, identified eighteen photographs that he took during the course of his investigation as depicting Hall. The photos were admitted into evidence over defense counsel's objection.

## C.  Keith Pikett

Deputy Keith Pikett of the Fort Bend County Sheriff's Office testified that he is a "dog handler" and that he has used bloodhounds to make "scent identifications" at crime scenes "[t]housands" of times. After Hall's attorney moved to suppress Deputy Pikett's testimony, the trial court held a hearing on the motion outside the presence of the jury. Deputy Pikett then described his methodology:

> Well, we take and put out six quart-size paint cans that are numbered so you can tell one from another. And we put it so that the wind is crossways so the scent is not blowing from Can Two into Can Three or One; it's blowing this way so it's not affecting it. Then somebody other than myself sets out six scents of six people and we do it by race and sex, so I ask them and I have bags of hundreds of whites and blacks and Asians.
>
> And so they pick filler scents and the scents of the potential suspects. They place them out in the cans. I don't know which person's in which can. And then we bring the dogs out—I have three of them I'm using in this case—one

---

[9] Investigator Brooks also stated that J.W. picked Justin Padgett out of a different photo array, but that she had only identified him as someone she had seen before.

at a time. They're allowed to smell some piece of evidence, and what they're doing is trying to see [if] the smell on this piece of evidence [is] the same as the smell on one of these cans. And the key to this is the dog is given the same reward if he picks somebody in one of the six cans or if he picks nobody, they're praised and given a reward. So they have no reason to just even pick a can at random.

Deputy Pickett then stated that he had the dogs smell the shell casings found at the scene of Aaron's murder, and that the dogs then each alerted to a can containing Hall's scent. He also performed three tests in which he had the dogs smell the blue denim shirt found at the crime scene; the dogs unanimously alerted to cans containing Hall's, Ray's, and Underwood's scents in each of the three tests, respectively.[10]

On cross-examination, Deputy Pikett admitted that "the dogs are not infallible"; he also agreed that if the dogs are sick, that might affect their sense of smell, but that he did not check their health before administering the tests at issue here. He stated, however, that in all of the tests he has done, one of the dogs "is now up to twenty-three hundred and thirty-four cases with [only] two errors and the other dogs have no errors." The trial court overruled the defendants' objections and admitted Deputy Pikett's testimony, as well as a video recording of the tests.

### D.    Kevin Tanton

Tanton stated that he met Underwood while serving time in the Liberty County Jail. Underwood was also "involved with Aryan Circle," which Tanton described as "a cross between a militia group and a prison gang I guess." Tanton stated that he met Hall at a Christmas party in 2007. In January of 2008, Hall drove Tanton and Underwood to Fulton, Texas, so that the men could help an Aryan Circle member named "Sid" remove several members of a rival gang from his house. Tanton stated that Hall had an "oldish revolver" with him at the time and that Hall had expressed the desire to obtain more firearms in order to confront the rival gang members. According to Tanton, the group then met up with Ray and "Sid." Tanton then identified Pate in the courtroom as the gang member he knew as

---

[10] Deputy Pikett acknowledged on cross-examination that the tests had been administered approximately five months after the evidence was recovered from the crime scene.

"Sid." Tanton stated that Pate then told Underwood and Hall how to approach the house where the rival gang members were without being seen. According to Tanton, Pate represented that the house belonged to him. The group then traveled to the house and gathered at a small shed nearby. According to Tanton, Pate "started acting really sketchy at this point. He said he was going to pull phone lines. And when we all took off to go to the house, [Pate] ran around the house and I didn't see him again, really . . . ." Tanton stated that "[e]verybody had a weapon at that point" and that Hall in particular was carrying his revolver. Tanton identified the revolver pulled from Copano Bay as the one carried by Hall on the night in question.

Tanton testified that he, Hall, Underwood, and Ray then approached the house. When they entered, Tanton observed "a female standing in front of the door" and a man "laying on the bed" next to the door. Tanton and Underwood ushered the girl into a room and shut the door; they then returned to see Hall and Ray "standing over the guy [in the bed]. Hall had the gun pointed at him, like, toward his face." Tanton stated that Ray "was hitting [the man in the bed with w]hatever he had in his hands, stick, pole type object thing." Tanton himself hit the man "when he was crawling away" with a pipe segment he had found in front of the trailer. Tanton continued:

> As the guy was, like, turning to face off and squirming away, like, trying—he was, like, trying to get up to get out the door I guess. Hall—I mean, Hall shot him. I mean, actually didn't see the shot, but, you know, he had the gun in his hand. . . . And then I see the guy get up and, I mean, I could actually see the wound, the puncture.

According to Tanton, the group drove away without Pate after the shooting, and as their vehicle passed over a bridge,

> Hall handed me the firearm and told me to throw it out the window. . . . And then he told me to take off my sock. . . . So I opened it up like this and [Hall] reached in his coat pocket and he pulled out the bullets and he put the bullets in my sock and then he told me to throw my sock with the bullets out the window, too.

Tanton stated that he had since pleaded guilty to aggravated assault for his participation in the events of January 4, 2008. He denied that he had been made any deal or

7

agreement with the State in exchange for his original statement to police.

On cross-examination, Tanton acknowledged that he knew of individuals in the Aryan Circle named Scott and "Ace" but denied that he had ever heard of Padgett or "Doughboy." Tanton denied that Scott or Padgett participated in the attack on Aaron; he also denied that Underwood was actually the one carrying the gun that night. Tanton agreed with defense counsel that Hall "didn't really mean to shoot" Aaron. He further acknowledged that he used methamphetamine on the night in question.

### E.     Michael Underwood

Underwood stated that he was a member of the Aryan Circle and that he knew of Scott and "Ace" as higher-ranking members in the gang. Underwood testified that he traveled with Hall, then his roommate, from Houston to the Watsons' trailer in November of 2007. The two made the trip because "[s]upposedly [Pate's] old lady got almost raped or something like that. . . . [we came down t]o go find the guy who tried to do it." Underwood stated that both he and Hall carried .38-caliber handguns at the time. The two met up with Ray and continued to the Watsons' trailer, where they met Tracy, J.W., and M.W.[11] The group "dr[ove] all over [Fulton] . . . on a wild goose chase" but could not locate the man they suspected of attempting to rape Tracy.

Several weeks later, on January 4, 2008, Underwood returned to Fulton because "[s]upposedly somebody was at Pate's house holding his kids and his old lady hostage or something." On his way, Underwood picked up Tanton "[j]ust to have somebody extra come with us. . . . [bec]ause there was supposed to be more than—more than two guys at that trailer." According to Underwood, Hall was carrying the revolver that was later pulled out of Copano Bay. Underwood rode with Pate and Ray to what he believed was Pate's trailer. Pate was giving the group directions on how to get into the trailer. When the group stopped at a shed near the trailer, Pate "[s]aid he wanted the dude there ran off."

_____

[11] Underwood stated that Pate had led him to believe that the trailer belonged to Pate, that Tracy was Pate's wife, and that J.W. and M.W. were Pate's children.

Pate then "went to the side of the house, not the trailer, and did something. Then he started walking, like, towards the woods." Underwood then approached the trailer, at which point the door was opened by a young girl. Underwood testified that he saw an unarmed man, whom he did not recognize, laying on a bed next to the door in the trailer. He and Tanton took the girl to a room in the trailer and shut the door. When Underwood returned, "everybody was running out the door" and a "muffled" gunshot could be heard. Underwood then saw Hall "[h]olding [a gun] in his hand, running." The group then drove off, with Tanton throwing a gun and a sock containing bullets off of the Copano Bay bridge. On their way back to Houston, Hall "said he shot him [be]cause he kept looking at him" and "[h]e said he tried to shoot him again and the gun jammed or something."

Underwood, like Tanton, pleaded guilty to aggravated assault for his participation in Aaron's killing and denied that he was promised anything by the State in exchange for his initial statement to police.

Underwood testified on cross-examination that he once communicated with Padgett and that he understood that Padgett was also a member of the Aryan Circle. Underwood denied defense counsel's suggestion that he borrowed Hall's truck and "met up with Scott and Ace to take care of Mr. Watson" on January 4, 2008.

## F. Anthony Ray

Ray stated that he was recruited to become a member of the Aryan Circle while serving time in the Aransas County Jail, and that he met Pate in 2007. Ray stated that, within the gang, his nickname was "Spooky." According to Ray, in November of 2007, Pate "had called down Chris Hall and Underwood and they came down and I guess we were going to—supposed to be going to fight with these guys that were supposedly sexually assaulting his girlfriend." However, all the group did was "[j]ust dr[i]ve around aimlessly" for "several hours."

Ray testified that on January 4, 2008, Pate told him that "all these guys are there at the trailer and they're sexually assaulting his girlfriend and that we were going to go over

9

there and run them off, you know, and Scott is sending down these guys from Houston." Ray stated that he visited Padgett's house on that day to pick up some methamphetamine. He and Pate then met up with Underwood, Hall, and Tanton in Fulton. According to Ray, Pate told the group that "we were going back to that trailer that we had gone to before and he was just telling us, 'Hey, we're going to go run these dudes off,' you know." When they arrived at the trailer, Pate led the group to the shed near the trailer, then "went back around" the trailer purportedly to cut the trailer's phone lines. Ray stated that the group "snuck up to the door" and "the little girl was right there at the door. . . . It was Underwood or Tanton that took the two little girls into another room and I guess to keep them out of danger, you know. And then it was just me and Chris Hall and whoever else." Ray saw a man he did not recognize on the bed near the door; he first realized that Hall had a gun when Hall sat down next to the man on the bed. Ray testified that Pate had told him that Aaron was the name of the person they were looking for. Hall asked the man on the bed to state his name; when the man did not comply, Hall "tapped him on the head with the gun." Ray "got impatient and . . . punched [the man] in the face" two or three times with a closed fist. Ray continued:

> Then, well, Chris puts a gun to him. It looked to me like he put it under his leg at the time. I thought he had put it under his leg. I guess not. But, anyway, he puts the gun up to him and he puts a pillow on it and then, you know, 'pop,' you know, 'bang,' you know. Didn't really sound that loud but . . . I knew that the gun had discharged. I didn't think he was hit. I mean, just the way he just got up and just ran like that, you know, perfectly capable.

The group then ran out of the house and departed in their vehicles, with the exception of Pate, who "had disappeared."

Ray denied that "Ace," Scott, or Padgett were present at the scene on the night in question. He further stated, like Tanton and Underwood before him, that he had not entered into any agreement with the State in exchange for his initial statement to police.

G.      J.W.

J.W. testified that she is thirteen years old and in the seventh grade. She identified Pate in the courtroom and stated that he "was my mom's boyfriend" and that he had once

10

lived in the trailer with the Watsons. On the night J.W.'s father died, Pate was not living at the trailer and J.W.'s mother and grandmother were not present because they were in jail. J.W. stated that, at some point that night, she wanted to leave the trailer to get medicine from her grandmother's house next door. She opened the front door to the trailer and saw "five or six" men, one of whom had a bat and one of whom had a gun with "a little wheel on it . . . like the western kind." The gunman pushed her into her room with her younger sister, M.W., and closed the door. After a while, the girls emerged from the room, saw that no one remained in the trailer, and M.W. called the police. J.W. exited the trailer and saw her father lying injured in the back of a neighbor's house. After the police arrived, J.W. and M.W. went to another neighbor's house and spent the night there.

J.W. stated that, "a few months" before her father died, Pate "was out, like, around the porch of my grandma's house and then he said, 'I'm going to bury your dad six feet under.' . . . And he said about my grandma, 'I have a bullet with her name ready on it.'"

On cross-examination, J.W. denied that she knew the gunman's name to be "Charles." When asked if she knew "a guy named Ace," J.W. responded, "I've heard his name, but I don't really know what he looks like." On further questioning, J.W. stated that "Ace" was the man that she saw with a baseball bat. She then stated that "Ace" was the gunman and "the one with the bat, I think it was Charles." J.W. further stated that the man she picked out on the photo array presented to her by Investigator Brooks was, in fact, not at the house that evening.

H.    M.W.

M.W. testified that she is eleven years old and in the sixth grade. Like her sister, M.W. identified Pate in the courtroom and stated that he had lived with the family "for about a year" previously, but not on the day her father was shot. At one point "a few weeks before this happened to my dad," Pate "said he was going to bury my dad six feet under." Pate also "said that he was going to get Ace and all his buddies and come hurt my dad." According to M.W., Pate once "brought his buddies from the Aryan Circle [to the

11

trailer] . . . they were going to hurt some guy named J.R. . . . [bec]ause he was messing with my mom." On the night of January 4, 2008, "about five" of the men, one of whom had a gun, "shoved their way in" to the trailer as J.W. was opening the front door. One of the men pushed the girls into a room and shut the door. When M.W. heard the men leave, she went to her grandmother's house to call the police. After calling the police, she went looking for her father; she found him lying down in the neighbors' yard "moaning." When asked whether she had heard any gunshots that evening, M.W. replied: "Yes. . . . Once me and my sister were in our room, we went outside and then that's when we heard the gunshot." She did not see who fired the shot. She stated that the man she picked out from Investigator Brooks's photo array was one of the men who entered her house that evening.

On cross-examination, M.W. acknowledged that one of the men who entered the trailer was named "Ace" and another was named "Thunderwood." She also agreed that, with respect to one of the photo arrays that had been presented to her by Investigator Brooks, she was unable to identify any of the individuals depicted as having been in her house that night.

## I.    Justin Padgett

Padgett testified that he is currently incarcerated for possession of methamphetamine and that he "[u]sed to" be associated with the Aryan Circle. He stated that he knew Pate and Aaron and that Aaron stayed with him at his house "a half a week or a week prior to his death." On the night of January 3, 2008, Pate arrived at Padgett's trailer with another man seeking to purchase "some dope or some pills." According to Padgett:

> [Pate] questioned me where Aaron Watson was. I told him Aaron wasn't staying there. . . . Also asked me if I knew where maybe any places he could be at. I told him no I didn't. Asked him what the deal was. He told me that he was looking for him. He was going to handle up on him, handle some business with him. . . . He asked me if I'd ride with him to go handle, you know, to go talk to him, handle up some business, and I told him no, I was busy.

12

Padgett denied that he was at the Watsons' trailer on the night in question, and he denied having any involvement with Aaron's murder.

**J.     Jennifer Leyva**

Jennifer Leyva testified that she is the mother of Padgett's four-year-old child and was living with Padgett on January 3, 2008. That evening, a man going by the name of "Sid" showed up at Padgett's residence. Leyva overheard "Sid" asking Padgett for methamphetamine and asking him to come with him. After "Sid" departed, Leyva and Padgett "talked and we were intimate with each other and then we fell asleep . . . [at] about 1:00 or 2:00 in the morning." Leyva stated that she spent the night at Padgett's residence and that Padgett did not leave at any point during the night. On cross-examination, Leyva stated that Padgett did sell methamphetamine to Pate on that occasion.

**K.     Suni Lee**

Suni Lee testified that, on January 3, 2008, she was employed at a liquor store in Rockport, Texas. She stated that she was acquainted with the Watsons and their children. At some time after 3:00 p.m. on that day, Pate entered the store and purchased a beer and a pack of cigarettes. While he was there,

> [Pate] said that he had just gotten out of jail and it was because him and Tracy—Aaron and Tracy and Chad apparently had an altercation of some sort and that was why he went to jail. And then he said that he had something for that Aaron. It was basically all he said to me.

**L.     Tracy Watson**

Tracy stated that she and Aaron were married in 1998 and were still married at the time of Aaron's death. She knew Pate because he and Aaron were best friends. In 2007, Pate came to Fulton and Aaron allowed Pate to stay with the family in their trailer. At some point, Tracy and Aaron separated; within a couple of weeks thereafter, Pate and Tracy "became intimately involved." Aaron came back to the trailer "[e]very weekend" to visit his daughters, and initially, he and Pate "still talked and they got along okay." At some point, however, the relationship between Aaron and Pate changed. According to Tracy:

> Probably about three or four months after me and Pate had been together,

13

things started getting . . . I don't know. Pate would get mad whenever Aaron would come over because I think that Pate felt threatened that Aaron was trying to get back with me, which he was. He wanted me back and I wasn't ready to go back with him yet 'cause he didn't want to settle down and stay home. He just wanted to run the streets.

Tracy also stated that, "a few months before" her husband's death, Pate "[s]aid he was going to kill [Aaron] . . . [and] that he was going to have his arms and legs broken."

According to Tracy, Pate was arrested on December 26, 2007 "in reference to a female's stolen purse." Aaron then moved back into the trailer. Tracy testified that, when Pate was released from jail on January 3, 2008, "Aaron and I were on our way to the sheriff's department to get a criminal trespassing warrant put against [Pate] so that problems wouldn't start." When they arrived at the sheriff's office, "[t]hey said they had a warrant for me for theft and they put me in jail. And then a couple of days later, the charges were dropped. They said that it was a misidentification."

Tracy further stated that in November of 2007, a man by the name of J.R. knocked on the door of the Watsons' trailer, looking for Pate. Tracy responded that she didn't know where Pate was, but "J.R. didn't want to leave. He tried taking my clothes off and trying to get me to have sex with him and stuff. And I told him 'no.' I told him to get out and leave, and he finally left." When Tracy told Pate about what J.R. did, Pate "was angry. . . . And then a few days later, about a couple of weeks later, three people came to my property to see [Pate]. . . . Pate said they were there to beat J.R. up." The three men were introduced to Tracy as "Underwood, Ziggy and Spooky."

On cross-examination, Tracy acknowledged that she did not call the police when J.R. tried to rape her "[b]ecause he didn't get violent. . . . He was just trying to take my shirt off and my pants ended up getting torn and he left when I told him to." She denied having told police that Aaron owed Padgett four hundred dollars for a drug purchase. She also stated that J.R.'s last name is Moore and that he is not the same person as Padgett.

### III. DISCUSSION

#### A. Corroboration of Non-Accomplice Testimony

14

By his first issue on appeal, Pate contends that there was insufficient evidence presented at trial to corroborate the testimony of his alleged accomplices.

Article 38.14 of the code of criminal procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."  TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005).[12]  The evidence used for corroboration does not need to be in itself sufficient to establish guilt beyond a reasonable doubt, nor must it directly link the accused to the commission of the offense.  *Patterson v. State*, 204 S.W.3d 852, 859 (Tex. App.–Corpus Christi 2006, pet. ref'd) (citing *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992)).  The accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony; however, evidence of such presence coupled with other suspicious circumstances may tend to connect the accused to the offense.  *McAfee v. State*, 204 S.W.3d 868, 871 (Tex. App.–Corpus Christi 2006, pet. ref'd) (citing *Dowthitt*, 931 S.W.2d at 249; *Gill*, 873 S.W.2d at 49; *Cox*, 830 S.W.2d at 611).  Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.  *Id.* (citing *Dowthitt*, 931 S.W.2d at 249; *Munoz*, 853 S.W.2d at 559).  The absence of "smoking gun" evidence does not invalidate evidence that does connect the defendant to the offense.  *Id.* (citing *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999)).

Pate argues that much of the State's corroborative evidence relates to Pate's

---

[12] An accomplice is a person who participates with a defendant before, during, or after the commission of a crime and acts with the required culpable mental state.  *Patterson v. State*, 204 S.W.3d 852, 858 (Tex. App.–Corpus Christi 2006, pet. ref'd) (citing *Kutzner v. State*, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999)). As co-indictees, Underwood, Ray, and Tanton are accomplices of Pate as a matter of law.  *See id.* (citing *Hendricks v. State*, 508 S.W.2d 633, 634 (Tex. Crim. App. 1974)).

alleged motive to have Aaron killed. Specifically, Tracy testified that she became involved in an "intimate" relationship with Pate when Aaron moved out of the trailer. When she advised Pate that J.R. had attempted to sexually assault her, Pate "became angry" and three of Pate's associates came to the Watsons' trailer "to beat J.R. up."[13] Eventually, Pate became "mad whenever Aaron would come over" because, according to Tracy, Pate "felt threatened that Aaron was trying to get back with [her], which he was." Tracy then resumed her relationship with Aaron when Pate was incarcerated. According to the State, this testimony established that Pate had a motive to kill Aaron. However, as Pate correctly notes, evidence of motive alone will not be sufficient to corroborate the testimony of accomplice witnesses. *Leal v. State*, 782 S.W.2d 844, 852 (Tex. Crim. App. 1989) (citing *Reynolds v. State*, 489 S.W.2d 866, 872 (Tex. Crim. App. 1972)).

Nevertheless, motive is a factor that may be considered with other evidence tending to connect the accused with the crime. *Id.* (citing *Paulus v. State*, 633 S.W.2d 827, 832 (Tex. Crim. App. 1982)). Here, several non-accomplice witnesses testified that Pate made verbal threats against Aaron. Specifically, both J.W. and M.W. testified that Pate said he was "going to bury [Aaron] six feet under"; Padgett testified that Pate was looking for Aaron on the night of the murder and that Pate said he was "going to handle up on [Aaron], handle some business with him . . ."; Lee testified that, the day before the murder, Pate told her that he was in jail "because [of] . . . Aaron and Tracy" and said that "he had something for that Aaron"; and Tracy testified that Pate said "he was going to kill [Aaron] . . . [and] that he was going to have his arms and legs broken." Tracy also testified that, when Pate was released from jail, she and Aaron sought "a criminal trespassing warrant" against Pate "so that problems wouldn't start." The State argues that this evidence was sufficient to connect Pate to Aaron's murder.

In response, Pate points to *Smith v. State*, 286 S.W.3d 412, 423-38 (Tex.

---

[13] M.W. also testified that Pate "brought his buddies from the Aryan Circle . . . to hurt some guy named J.R. . . . [bec]ause he was messing with my mom."

16

App.–Corpus Christi 2008, pet. granted), in which this Court found insufficient evidence to corroborate an accomplice's testimony that the defendant killed her husband and father-in-law. In that case, we noted that non-accomplice testimony establishing that the defendant had a motive and opportunity to commit the charged offense was, by itself, insufficient corroboration. *See id.* at 427. We then examined whether other evidence connected the defendant to the crime; specifically, we considered evidence that allegedly established that the defendant, inter alia: (1) "did not act as a normal person would act on the day of the murders"; (2) "acted unusually upon discovering the bodies"; (3) "was aware that guns were missing from [her] house and that [the victims] had been shot before that information was officially released to her"; (4) "did not act like a grieving widow after the murders"; and (5) "told her daughter . . . to be careful of what she said to the police." *Id.* at 429. We found that none of these pieces of evidence connected the defendant to the crime; therefore, "the cumulative force of the evidence" was not enough to corroborate the accomplice testimony. *Id.* at 438. Pate urges that "there is far less corroboration of the accomplices' testimony in the instant case than in *Smith*." We disagree. In *Smith*, there was no evidence of the defendant threatening the life of the victims, as there is here. Pate does not direct us to any case law, and we find none, stating that verbal threats to the victim made by the defendant may not be used to connect the defendant to the crime for purposes of corroboration. Instead, it is well established that "sufficient accomplice-witness corroboration may be furnished by the suspicious conduct of a defendant." *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008); *see Burks v. State*, 876 S.W.2d 877, 888 (Tex. Crim. App. 1994) (holding that appellant's threats to his aunt, when she said that she would call the police if she found out that appellant was involved in the offense, was evidence that tended to connect the appellant to the offense).

Here, non-accomplice testimony established that Pate made numerous verbal threats toward Aaron; that Pate was looking for Aaron soon after being released from jail on January 3, 2008; and that Aaron's murder occurred shortly thereafter. This evidence

17

of "suspicious conduct," in combination with evidence establishing Pate's motive, was more than sufficient to "tend[] to connect" Pate with Aaron's murder. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14. Pate's first issue is overruled.

**B.      Evidentiary Sufficiency**

By his second issue, Pate argues that the evidence was legally and factually insufficient to support his conviction as a party to Aaron's murder.

We review the legal and factual sufficiency of the evidence supporting a conviction under well-established standards. In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). We must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). We are not required to determine whether we believe that the evidence at trial established guilt beyond a reasonable doubt; rather, when faced with conflicting evidence, we must presume that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). In conducting a factual sufficiency review, we consider the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). The verdict will be set aside only if it is (1) so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, or (2) against the great weight and preponderance of the evidence. *Id.* at 415 (citing *Johnson v. State*, 23 S.W.3d 1, 10 (Tex. Crim. App. 2000)).

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet.

ref'd). Under such a charge, Pate committed the offense of murder if he (1) intentionally or knowingly (2) caused the death of Aaron Watson. *See* Tex. Penal Code Ann. § 19.02. Under the law of parties, a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (Vernon 2003). When we review the sufficiency of the evidence supporting a defendant's participation as a party to the crime, "we may consider 'events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000) (quoting *Ranson v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)). Additionally, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

In his evidentiary sufficiency argument, Pate claims that the State presented "no evidence outside the testimony of accomplices" that Pate was "at the trailer planning the offense" or that he was "ever at the murder scene." However, a challenge of insufficient evidence to support the verdict is not the same as a challenge of insufficient corroboration, but is instead governed by a different test. *Yost v. State*, 222 S.W.3d 865, 871-72 (Tex. App.–Houston [14th Dist.] 2007, pet. ref'd) (citing *Cathey v. State*, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999) (en banc); *Torres v. State*, 137 S.W.3d 191, 196 (Tex. App.–Houston [1st Dist.] 2004, no pet.)). In a legal and factual sufficiency review, we consider all the evidence, even uncorroborated accomplice testimony. *See id.* at 875. Accordingly, the fact that some of the accomplice witnesses' testimony was not corroborated is immaterial to our analysis of Pate's second issue.[14]

---

[14] Pate also argues that the case against him is circumstantial in nature and cites *Brandley v. State* for the proposition that "in a circumstantial evidence case, the State . . . must . . . exclude every reasonable hypothesis raised by the evidence that would tend to exculpate the accused." 691 S.W.2d 699, 703 (Tex.

Pate further asserts generally that "the State presented no evidence that he did anything to aid, assist, encourage, solicit, direct or attempt to aid the shooter" or that Pate possessed the requisite mental state. We disagree. Tanton and Underwood testified that Pate and Hall accompanied them to the trailer on January 4, 2008 and that Pate instructed the group on how to approach the trailer without being seen. Underwood testified that Pate "[s]aid he wanted the dude there ran off." Ray testified that Pate told the group that they were looking for a man named Aaron. Additionally, as noted, the record is replete with evidence that Pate had a motive to kill Aaron; that he had made threats against Aaron on several prior occasions; and that he had recently sought to "beat up" an individual who had allegedly attempted to assault Tracy. From this evidence, a rational jury could have found that Pate solicited, encouraged, directed, aided, or attempted to aid Hall in causing Aaron's death. *See* TEX. PENAL CODE ANN. § 7.02(a)(2). We find in particular that the evidence allowed a rational jury to find that Pate "act[ed] with intent to promote or assist the commission of the offense." *See id.* Accordingly, we conclude that the evidence was legally sufficient to support the verdict. Moreover, considering all of the evidence in a neutral light, we cannot say that the verdict was clearly wrong, manifestly unjust, or against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 415. Therefore, the evidence was factually sufficient to support Pate's conviction.

Pate's second issue is overruled.

## C.    Jury Charge Error

By his third issue, Pate argues that the trial court's jury charge contained four different reversible errors. Specifically, Pate contends that the charge was erroneous because: (1) it did not instruct the jury that accomplices cannot corroborate each other; (2) it did not define "accomplice as a matter of law"; (3) it did not ask whether Padgett was

---

Crim. App. 1985). However, this tenet of law has been explicitly overruled by the Texas Court of Criminal Appeals. *See Geesa v. State*, 820 S.W.2d 154, 157-61 (Tex. Crim. App. 1991) (rejecting the "reasonable hypothesis analytical construct" under which courts were required to instruct juries not to convict on circumstantial evidence unless "every reasonable hypothesis other than guilt" is excluded), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000).

20

an accomplice as a matter of fact; and (4) it materially varied from the indictment. Hall, by his third issue, joins Pate in complaining that the charge was erroneous because it lacked an instruction that accomplices cannot corroborate each other.

Neither trial counsel objected to the jury charge at trial. When reviewing unobjected-to jury charge error, we must first determine whether the charge was erroneous. *See Tolbert v. State*, 306 S.W.3d 776, 779 (Tex. Crim. App. 2010). If we determine that error occurred, we then consider whether the error caused egregious harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Egregious harm will be found only if the error deprived the defendant of a fair and impartial trial. *Ex parte Smith*, 309 S.W.3d 53, 63 (Tex. Crim. App. 2010) (citing *Almanza*, 686 S.W.2d at 171).

### 1. Failure to Instruct That Accomplices Cannot Corroborate Each Other

The trial court issued two charges to the jury—one with respect to Pate and one with respect to Hall. Both charges stated, in relevant part, as follows:

> You are instructed that an accomplice as the term is herein after [sic] used means any person connected with the crime charged, as a party thereto, and includes all person[s] who are connected with the crime, as such parties, by unlawful act or omission on their part transpiring either before or during the time of the commission of the offense. . . .
>
> The witnesses Michael Jason Underwood, Anthony Lee Ray, and Kevin Ray Tanton are accomplices. If an offense was committed, you cannot convict the defendant upon accomplice testimony unless you first believe that the testimony is true and shows the defendant is guilty as charged and then you cannot convict the defendant upon said testimony unless you further believe that there is other testimony in the case, outside the evidence of the said witnesses Michael Jason Underwood, Anthony Lee Ray, and Kevin Ray Tanton tending to connect the defendant with the offense committed, if you find that an offense was committed, and the corroboration is not sufficient [if] it merely shows the commission of the offense but it must also tend to connect the defendant with its commission, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

Pate and Hall argue that this language was insufficient to precisely instruct the jury that the testimony of one or more accomplices cannot be used to corroborate the testimony of another accomplice.

21

Pate and Hall are correct that, where more than one potential accomplice testifies, the trial court must inform the jury that accomplices may not corroborate each other's testimony. *See, e.g., Fields v. State*, 426 S.W.2d 863, 865 (Tex. Crim. App. 1968). However, as the State points out, the language used in the Pate and Hall jury charges has been found to be sufficient for that purpose. *See Barrera v. State*, 756 S.W.2d 884, 886 (Tex. App.–San Antonio 1988, pet. ref'd). In *Barrera*, the San Antonio Court of Appeals considered a jury charge containing language that is identical, other than the names of the accomplices, to that which was included in the jury charges in the present case and which is set forth above. *See id.* The court concluded:

> As is evident from a reading of the . . . portion of the charge quoted above, the trial court did in fact charge the jury . . . that one accomplice could not corroborate another. That portion [of the charge] wherein the court instructed the jury that they could not convict appellant unless they believed there was testimony outside of the evidence given by the three accomplices that tended to connect the appellant with the offense is sufficient to inform the jury that one accomplice cannot corroborate another.

*Id.* We agree with the *Barrera* court and find that the jury charges in the instant case sufficiently instructed the jury that accomplices cannot corroborate each other. Hall's third issue is overruled. We now proceed to consider the other complaints raised by Pate as to the jury charge.

## 2. Failure to Define "Accomplice as a Matter of Law"

Pate argues that the jury charge "fails to sufficiently define what an 'accomplice as a matter of law' is as required and discussed in detail in *Smith*," 286 S.W.3d at 412-38. Pate notes specifically that "[t]he charge discusses the law of [p]arties in Item No. 3 of Count I but fails to instruct the jury as to the law of accomplice testimony until Cou[n]t II, Item 13 of the [c]harge." He concludes that, "[t]herefore, there are no instructions in Count I of the Charge dealing with accomplices whatsoever."

Pate does not cite any authority other than *Smith* to support his positions that (1) a jury charge must include a definition of "accomplice as a matter of law," and (2) a definition included in one part of a jury charge may not be considered in our evaluation of whether

22

an error is shown in a separate part of the charge. In *Smith*, as noted, we found that there was insufficient evidence to corroborate the testimony of Boone, the defendant's accomplice. *Id.* at 438. We also discussed the jury charge in that case; specifically, we addressed Smith's issue claiming that the charge was erroneous because it asked the jury whether or not Boone was an accomplice as a matter of fact. *Id.* at 420. We concluded that, because the record clearly demonstrated that Boone was charged with murdering the same individual that Smith was charged with murdering, Boone was an accomplice as a matter of law. *Id.* at 423. Therefore, it was error to ask the jury whether he was an accomplice as a matter of fact. *Id.* At no point in *Smith* did we hold that a jury charge must define "accomplice as a matter of law," nor did we state that any such definition must be set forth in any particular part of the charge. Without more, we cannot conclude that the trial court's failure, if any, to define "accomplice as a matter of law" in the jury charge was erroneous.

### 3. Failure to Ask Whether Padgett is an Accomplice as a Matter of Fact

Pate next contends that he was egregiously harmed by the lack of a question in the jury charge asking whether Padgett was an accomplice as a matter of fact. "[A] person is an accomplice if there is sufficient evidence connecting them to the criminal offense as a blameworthy participant." *Blake v. State*, 971 S.W.2d 451, 454-55 (Tex. Crim. App. 1998). When there is a question from the evidence whether a witness is an accomplice, it is proper to submit that fact issue to the jury. *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987). However, "[i]f the evidence is clear that the witness is not an accomplice witness, no charge need be given to the jury either that the witness is an accomplice witness as a matter of law or in the form of a fact issue whether the witness is an accomplice witness." *Id.*

Padgett testified that he "[u]sed to" be associated with the Aryan Circle; that he knew Pate and Aaron; that Aaron had stayed at his home prior to his murder; and that Pate had inquired about Aaron's whereabouts on the night of the murder. Further, Investigator

23

Brooks testified that Tracy told him that Aaron owed Padgett four hundred dollars, and that J.W. picked Padgett out of a photo array but that she had only identified him as someone she had seen before. Pate contends that this evidence raised a fact question as to whether Padgett was an accomplice as a matter of fact. We disagree. There was no evidence adduced indicating that Padgett was with either Pate or Hall at the trailer on the night of January 4, 2008; nor was there any evidence adduced indicating that Padgett committed any act in furtherance of the offense or evinced an "understanding and common design to do the prohibited act.'" *King*, 29 S.W.3d at 564 (quoting *Ranson*, 920 S.W.2d at 302). In fact, uncontroverted evidence established that Padgett declined to go with Pate to "handle some business" with Aaron on the night in question, and that he spent that entire night at his home with Leyva. We conclude that the trial court did not err by not including a question in the jury charge asking if Padgett was an accomplice as a matter of fact.

### 4. Variance Between Indictment and Charge

In the final part of his third issue, Pate argues that "[t]he variance between the indictment and the charge to the jury is confusing to the jury and lessens the burden of proof for the State to prove its case." Pate continues his argument as follows:

> The offense in the instant case, as alleged in the indictment and set out in the jury charge, was that [Pate] was charged with the offense of murder. However, the evidence does not show that Pate was criminally responsible for [t]he acts of others. Instead, it shows that Pate never requested, commanded or attempted the others [sic] to commit the offense as charged in the indictment.

It is unclear what, exactly, Pate is arguing here. To the extent that he is arguing that the evidence was insufficient to support his conviction as a party to Aaron's murder, we have already reached a contrary conclusion. To the extent that Pate is arguing that he may not be convicted as a party to a crime where the indictment alleged only that he was a principal actor in that crime, he is wrong. *See* TEX. PENAL CODE ANN. § 7.01(c) (Vernon 2003) ("All traditional distinctions between accomplices and principals are abolished by this section, and each party to an offense may be charged and convicted without alleging that he acted

as a principal or accomplice."); *Goff v. State*, 931 S.W.2d 537, 544 n.5 (Tex. Crim. App. 1996) ("A trial court may charge on [the] law of parties where there is no such allegation in the indictment.").

Having found no error in the jury charge, we overrule Pate's third issue.

## D. Improper Jury Argument

The following exchange took place during the State's closing argument at the guilt-innocence phase of trial:

| [Prosecutor]: | When you look at this case, ladies and gentlemen, I want you to think about this is your community [sic]. I want you to think about Mr. Watson's last words to his girls: "I love you." |
|---|---|
| | You know, [defense counsel] laughs, said, "I'd rather be home eating dinner." You know what? I bet Mr. Watson would, too. I best [sic] his family would want him home, too. I bet those two little girls sitting there would like to see their daddy again. But these two wild dogs took that away from them. |
| [Pate's counsel]: | I object to that, Judge. That's completely improper. I object to that and ask the Court to instruct the jury to disregard that statement. |
| THE COURT: | Ladies and gentlemen, that was an opinion and opinions do not go to jury argument. Please disregard. |

Pate and Hall, by their fourth issues, argue that the prosecutor's reference to them as "two wild dogs" was improper and substantially affected their rights. They further assert that the prosecutor's comment "inflamed the jury" and "prejudiced" them and, therefore, the trial court's instruction to disregard the comment did not cure the error. In response, the State contends that the prosecutor's comment could feasibly be considered a "summation of the evidence"[15] and that, even if the statement was erroneous, the error was not "so extreme or manifestly improper as to require reversal."[16] *See Brown*, 270 S.W.3d at 570 (holding

---

[15] "[P]roper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008).

[16] The State notes that a prosecutor's reference to a human defendant as an animal is not always improper. *See Burns v. State*, 556 S.W.2d 270, 285 (Tex. Crim. App. 1977) (finding that prosecutor's reference to defendant as an "animal" was not improper because "the record . . . reflects a 'bestial aspect.'").

25

that jury argument "error is not reversible unless, in light of the record, the argument is extreme or manifestly improper") (citing *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988)).

We do not reach the merits of this issue, however, because Pate and Hall have failed to preserve it for our review. The court of criminal appeals has concluded that an objection pursued to an adverse ruling is required to preserve jury argument error for appellate review. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007); *see* TEX. R. APP. P. 33.1; *see also Contreras v. State*, No. 13-09-00109-CR, 2010 Tex. App. LEXIS 4385, at *16-17 (Tex. App.–Corpus Christi June 10, 2010, no pet. h.) (mem. op., not designated for publication). As Pate recognizes in his appellate brief, the trial court never explicitly ruled on his counsel's objection to the prosecutor's statement. If anything, the trial court tacitly sustained the objection by instructing the jury to disregard the statement, which was precisely the remedy that Pate's counsel requested. In any event, we cannot conclude that either Pate or Hall "pursue[d their objection] to an *adverse* ruling." *Archie*, 221 S.W.3d at 699 (emphasis added). Accordingly, the issue has not been preserved for our review. Pate's and Hall's fourth issues are overruled.

### E. Admission of Evidence

#### 1. Scent Lineups

By his first issue, Hall contends that the trial court erred in admitting evidence of Deputy Pikett's canine scent lineup tests. We review a trial court's admission of evidence for abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). The trial court's ruling must be upheld if it was within the zone of reasonable disagreement. *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 381 (Tex. Crim. App. 1990)). In addition, we must review the trial court's ruling in light of what was before the trial court at the time the ruling was made. *Id.* (citing *Hoyos v. State*, 982 S.W.2d 419, 422 (Tex. Crim. App. 1998); *Hardesty v. State*, 667 S.W.2d 130, 133 n.6 (Tex. Crim. App. 1984)).

Texas Rule of Evidence 702 provides that "[i]f scientific, technical, or other

specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. The trial court's task in assessing admissibility under Rule 702 "is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992).

In *Kelly*, the Texas Court of Criminal Appeals set forth a three-prong reliability test and identified seven non-exclusive factors for courts to consider in assessing the reliability of scientific evidence. *See id.*[17] However, in *Nenno v. State*, the court of criminal appeals held that a "less rigor[ous]" requirement of reliability applies "[w]hen addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method." 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999). The appropriate questions in such cases are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. *Nenno*, 970 S.W.2d at 561. "Since interpretation of a dog's reaction to a scent lineup is based upon training and experience, and not scientific method, we apply the less rigorous *Nenno* test in this

---

[17] The *Kelly* court held that, to be considered reliable, evidence derived from a scientific theory "must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

Factors that could affect a trial court's determination of reliability include, *but are not limited to*, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id.* (emphasis in original).

case." *Winston v. State*, 78 S.W.3d 522, 526 (Tex. App.–Houston [14th Dist.] 2002, pet. ref'd) (citing *Brooks v. People*, 975 P.2d 1105, 1106 (Colo. 1999) (holding that canine scent-tracking evidence does not constitute evidence subject to *Daubert* scientific validation factors but that conventional Rule 702 and Rule 403 analysis should be applied)).

Hall argues that the evidence of Deputy Pikett's scent lineup tests fails the *Nenno* test "because there was no predicate evidence to show that Pikett's type of testing is accepted as a valid field of expertise by any canine or forensic experts other than Pikett." Hall asserts that "[Pikett's] 'scientific' testing and opinion is an unverifiable one-man show put on by a policeman to aid prosecutors."[18]

In *Winston v. State*, the Fourteenth Court of Appeals also considered whether evidence of Deputy Pikett's canine scent lineups was admissible under Rule 702. *See id.* In evaluating the first prong of the *Nenno* test, the court noted that "[t]he ability of certain breeds of dogs, especially bloodhounds, to distinguish humans by scent is well-documented." *Id.* (citing *State v. Roscoe*, 700 P.2d 1312, 1319-20 & n.2 (Ariz. 1984); *Roberts v. State*, 469 A.2d 442, 447 & n.5 (Md. 1983)). "[T]hese dogs' superior senses have long been used to aid mankind in a variety of contexts outside the courtroom, including 'to track by scent escaped criminals or lost persons and articles.'" *Id.* (quoting *People v. Price*, 531 N.E.2d 367, 269 (N.Y. 1981)). The court further noted that "[t]hirty-seven states and the District of Columbia admit scent-tracking evidence to prove the identity of the accused, provided a proper foundation is laid." *Id.* at 527. The court concluded that the use of scent lineups is a "legitimate field of expertise." *Id.*; *see Winfrey v. State*, No. PD-0987-09, 2010 Tex. Crim. App. LEXIS 1167, at*14-25 (Tex. Crim. App.

---

[18] Hall's argument with respect to his first issue appears to be limited to the first prong of the *Nenno* test; i.e., whether or not Deputy Pikett's field of expertise is legitimate. *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999). Hall does not contend on appeal that the subject matter of Deputy Pikett's testimony is outside the scope of his field of expertise, nor does he argue that Deputy Pikett's testimony failed to rely upon or utilize the principles involved in the field. That is, he does not contend that the evidence at issue failed either the second or third prong of the *Nenno* test. *See Nenno*, 970 S.W.2d at 561. Accordingly, we do not address those prongs in our analysis.

28

Sept. 22, 2010).[19]  Hall has given us no reason to reach a different result here.  We therefore conclude, as the *Winston* court did, that the trial court did not abuse its discretion in admitting evidence related to Deputy Pikett's scent lineup tests.  *See Winston*, 78 S.W.3d at 527.  Hall's first issue is overruled.

### 2.	Photographs of Hall's Tattoos

By his second issue, Hall argues that the trial court erred in admitting, over his counsel's objection, nineteen photographs of Hall.  The photographs, taken while Hall was in police custody, exhibited extensive tattooing on Hall's torso, arms, and legs.  Hall describes the tattoos as depicting "scantily clad women in bondage, knives, a menacing skull with warlike helmets, demons and devils with pitchforks, an armed man jumping off his stomach yelling a war cry, a tank with a cannon, an arm-length grim reaper, and a decomposing face with a menacing look."  Hall argues on appeal that "[t]he images were diabolical, violent and frightening" and prejudiced the jury.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  TEX. R. EVID. 401.  However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

---

[19] In *Winfrey v. State*, the Texas Court of Criminal Appeals ruled, in another case involving evidence of dog scent lineups presented by Deputy Pikett, that such evidence, standing alone, cannot be legally sufficient to support a murder conviction.  No. PD-0987-09, 2010 Tex. Crim. App. LEXIS 1167, at *14-25 (Tex. Crim. App. Sept. 22, 2010).  The court noted that "[i]dentifying someone's scent at a crime scene is not an indication of complicity.  It simply establishe[s] a direct or indirect relationship to the scene."  *Id.* at *16 (quoting Rex A. Stockham et al., *Specialized Use of Human Scent in Criminal Investigations*, 6 FORENSIC SCI. COMM. 3, 6 (2004)).  The court concluded that, even when viewed in the light most favorable to a conviction, dog scent lineup evidence "merely raises a suspicion of guilt" and is legally insufficient, by itself, to support a conviction beyond a reasonable doubt.  *Id.* at *19.  According to the court, "[t]he dangers inherent in the use of dog tracking evidence can only be alleviated by the presence of corroborating evidence."  *Id.* at *23 (quoting *State v. Loucks*, 656 P.2d 480, 483 (Wash. 1983)).  Therefore, "when inculpatory evidence is obtained from a dog scent lineup, its role in the court room is merely supportive."  *Id.*

Here, the State did not rely exclusively on Deputy Pikett's evidence; instead, there was plenty of other evidence adduced which was inculpatory as Hall.  Therefore, unlike in *Winfrey*, the dog scent lineup evidence was "merely supportive" in this case.  *See id.*  Moreover, the *Winfrey* court took care to note that "[c]ases involving the use of dogs, usually bloodhounds, to track humans are abundant and the law is well settled in regards to admissibility of such evidence . . . ."  *Id.* at *20-21.  Accordingly, *Winfrey* does not affect our analysis as to the admissibility of the scent lineup evidence.

29

undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007) (citing *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997)).

The State argues that the photographs were offered into evidence in order to prove that Hall participated in Aaron's shooting as a member of a criminal street gang, which is an element of the charged offense of organized criminal activity. *See* TEX. PENAL CODE ANN. § 71.02(a)(1).[20] The State notes that Isaac Leal, a criminal investigator for the 36th Judicial District, testified that Hall's distinctive tattoos as depicted in the photographs identified him as a member of the Aryan Circle.

Under the circumstances of this case, we cannot say that Hall overcame the presumption that relevant evidence is more probative than prejudicial. *See Gallo*, 239 S.W.3d at 762. We conclude that the trial court did not act beyond the zone of reasonable disagreement in admitting the photographs. *See Weatherred*, 15 S.W.3d at 542 (citing *Montgomery*, 810 S.W.2d at 381). Accordingly, the trial court did not abuse its discretion. Hall's second issue is overruled.

## IV. CONCLUSION

Having overruled all issues raised by Pate and Hall, we affirm the judgments of the trial court.

_____
DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
7th day of October, 2010.

---

[20] The penal code defines "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." TEX. PENAL CODE ANN. § 71.01(d) (Vernon 2003).